# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| DARYL FOLSE | CIVIL ACTION NO. 08-0717 |
|     La. DOC # 321408 | |
| VS. | SECTION P |
| | JUDGE JAMES |
| WARDEN ALVIN JONES, ET AL. | MAGISTRATE JUDGE HAYES |

### REPORT AND RECOMMENDATION

On May 19, 2008, *pro se* plaintiff Daryl Folse, an inmate in the custody of Louisiana's

Department of Public Safety and Corrections (LDOC), proceeding *in forma pauperis*, filed the

instant civil rights complaint pursuant to 42 U.S.C. §1983. Plaintiff is presently incarcerated at

the East Carroll Parish Detention Center (ECPDC), Lake Providence, Louisiana; however, when

he filed his complaint, he was confined at the River Bend Detention Center (RBDC) which is

also located in Lake Providence. Plaintiff complains of conditions of confinement and lack of

appropriate medical care and treatment at RBDC. He prays for an order directing the defendants

to transfer him to another prison facility where he can obtain "work release" status and for

punitive or compensatory damages of $275,000. He also prays for an order prohibiting RBDC

from selling tobacco to inmates. With regard to his medical neglect claims, he prays for an order

directing the RBDC medical department to devise and implement policies designed to ensure that

all incoming inmates are properly screened, diagnosed, and treated. He sues RBDC Warden

Alvin Jones, Assistant Warden James Shaw, the East Carroll Parish Sheriff's Office, East Carroll

Parish Sheriff Mark Shumate, the RBDC and the RBDC's Medical Department.

On August 28, 2008 plaintiff filed an amended complaint wherein he again alleged that

he has been denied appropriate medical care during his incarceration at the RBDC. In this

amended complaint he again named the following defendants, RBDC Assistant Warden Shaw, RBDC Medical Clerk Mrs. Posey, a member of RBDC's Medical Staff identified as Jim Doe (the defendant previously identified as "Jim") and East Carroll Parish Sheriff Mark Shumate. In this amended complaint, plaintiff seeks a temporary restraining order prohibiting the sale of tobacco at the RBDC and an order directing the RBDC Medical Department to provide him with prescription medication for his allergies.

This matter has been assigned to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the court. For the following reasons it is recommended that the complaint be **DISMISSED WITH PREJUDICE.**

### *Statement of the Case*

### *1. Original Complaint [rec. doc. 1]*

Plaintiff's original complaint was not on the form approved for civil rights complaints and was therefore determined to be deficient. In this 13 page hand-written pleading, plaintiff claimed in general, that the defendants – East Carroll Parish Sheriff Shumate (spelled Shoemaker in the complaint), the owner of RBDC and Warden Alvin Jones – (1) sell tobacco in a smoke free facility; (2) allow smoking in the facility; (3) neglect the rights of non-smokers to enjoy a smoke free environment; (4) sell tobacco to inmates confined in lock-down; (5) violate the "Clean Air Act;" (6) use improper grievance forms which result in inmates being unable to retain a copy of their grievance; (7) use improper medical forms for the same reason; (8) entrap smokers by selling tobacco then filing disciplinary reports on those who smoke in the facility; (9) deny inmates the right to file legal actions; (10) interfere with incoming legal mail and monitor outgoing legal mail; (11) transfer inmates who file lawsuits to disciplinary camp; (12) deny

proper access to the law library; (13) allow certain inmates access to other inmates personal, medical or criminal records; (14) allow inmates to book newly arrived inmates into the facility; (15) force inmates to sleep on the floor due to overcrowding; and, (16) deny proper administrative remedies procedure grievance forms. [rec. doc. 1, pp. 2-3]

Plaintiff then suggested that the court "... upgrade this law suit to a class action status..." to entitle 15 other non-smoking inmates who reside in D-Dorm some form of compensation. [rec. doc. 1, p. 4]

He then prayed for a transfer to a work-release facility to avoid potential retaliation by the RBDC staff and his fellow inmates. He also prayed for compensatory damages for "... pain, suffering, mental and physical stress, occurring  medical problems as well as problems which may arise in the future as a result of the inhalation of the harmful and deadly second hand smoke..." plaintiff claims he is forced to breathe each day at RBDC. [rec. doc. 1, p. 6]

In the same pleading he articulated more specific claims. [rec. doc. 1, pp. 7-12] According to plaintiff, he is allergic to tobacco smoke.  He conceded that RBDC has a no smoking indoors policy; he also claimed that RBDC has a three smoke break rule – three smoke breaks per day during which inmates are allowed outdoors. Plaintiff claimed  that the rule is not properly enforced or implemented. He complained that certain corrections officers enforce the no-smoking ban, but others do not. He also complained that even permitting smoking in the prison yard is a violation of the law.

He complained that the pre-trial detainees are confined in the prison's lock-down cells. These detainees are permitted to purchase tobacco products even though they are not permitted to leave the cell block, and even though, under Louisiana law and RBDC policy, smoking is

prohibited in the building. He claimed that he was confined to lock-down from February 29, 2008, the date he arrived at RBDC, to March 3, 2008. He shared a cell designed for four with seven other prisoners. Plaintiff was forced to sleep on the floor and there was no room to stand or walk in the cell. According to plaintiff, his 7 cell mates smoked constantly causing plaintiff's eyes to become irritated. He experienced burning and watering of his eyes and sinus blockage.

Upon his release from lock-down on March 3 he asked the guard escorting him to his dorm about medical attention. The officer advised plaintiff to submit a medical request form. He asked the officer about the smoking policy and the officer advised that smoking was not allowed inside the building. The officer advised plaintiff about the three-smoke break rule, which allows smokers to exit the building three times a day for smoke breaks, but admitted that some inmates disobey the non-smoking policy and smoke indoors.

Plaintiff was housed in D-Dorm. Again, he was forced to sleep on the floor because of overcrowding – 92 inmates occupying a dormitory with 80 bunks. He claimed that the inmates constantly violate the no smoking policy by ducking in between bunks and standing in the blind spots away from the view of the surveillance cameras. According to plaintiff, his exposure to second hand tobacco smoke has caused him to suffer constant headaches, burning eyes, and inflamed sinus.

He further claimed that his requests for medical attention were ignored. However, he admitted that after having been at RBDC for 23 days, and having submitted 3 medical requests and 1 grievance, he was called out for sick-call. He was examined by a member of the RBDC Medical Staff named Jim. Plaintiff advised Jim that he was allergic to tobacco smoke and that as a result of his exposure to smoke, he experienced breathing difficulties, and sleepless nights. He

also complained of pain in his right shoulder.  According to plaintiff, he had previously been diagnosed with a torn rotator cuff in his right shoulder[1] and that authorities at the East Baton Rouge Parish Prison had provided medication for that injury. Jim advised that plaintiff would be examined by a physician.

According to plaintiff, he submitted additional medical request forms, but, as of April 14, 2008 he had still not seen a physician.[2]  He admitted that Jim provided medication for plaintiff's sinus problems and aspirin for the pain in his shoulder.[3] He complained that as with the grievance forms, the forms supplied for medical requests do not permit prisoners to retain copies of their requests. [rec. doc. 1]

## 2. Amended Complaint and Attachments [rec. doc. 5]

### a. Statement of Claims and Facts – RBDC, Sheriff Shumate, and Warden Jones [rec. doc. 5-2, pp. 1-19]

On July 14, 2008 plaintiff amended his complaint. In this amended complaint, plaintiff again named RBDC Warden Alvin Jones, Assistant Warden James Shaw and East Carroll Parish Sheriff Mark Shumate as defendants, but omitted the East Carroll Parish Sheriff's Office, the

---

[1] Plaintiff described the injury as a torn rotator "cup." The shoulder joint is a ball and socket type joint where the top part of the arm bone (humerus) forms a joint with the shoulder blade (scapula). The rotator cuff holds the head of the humerus into the scapula. Inflammation of the tendons of the shoulder muscles can occur in sports requiring the arm to be moved over the head repeatedly as in tennis, baseball (particularly pitching), swimming, and lifting weights over the head. Chronic inflammation or injury can cause the tendons of the rotator cuff to tear. See *Medline Plus, A Service of the U.S. National Library of Medicine and the National Institutes of Health* at http://www.nlm.nih.gov/medlineplus/ency/article/000438.htm

[2] However, in his amended complaint plaintiff conceded that he was examined by Dr. Bailey within "30 plus days" of his arrival at RBDC. [see rec. doc. 5-3, p. 10 at ¶29]

[3] However, in plaintiff's amended complaint he claimed that certain medications prescribed by Dr. Bailey were withheld because plaintiff could not afford the medical co-pay.

RBDC and the RBDC's Medical Department. [rec. doc. 5, ¶ III] In this amended complaint he alleged the following:

He arrived at RBDC on February 29, 2008. Prisoner-trustees were allowed to perform the booking procedure and therefore had access to the criminal, medical and personal records of their fellow inmates; these trustees were allowed to search plaintiff's personal belongings and discard items considered contraband.

Upon his arrival, plaintiff was confined in lock-down; he was confined with 7 other inmates in a cell designed to house 4 inmates. Plaintiff was forced to sleep on a mattress on the floor next to the toilet. The other inmates smoked constantly exposing plaintiff to second hand smoke.

Although RBDC is a non-smoking facility, tobacco products are sold and the administration has taken insufficient precautions to prevent inmates from smoking inside the facility.

Plaintiff is allergic to cigarette smoke; as a result of his exposure to second hand tobacco smoke during the 3-day period he was confined in lock-down, he experienced an "allergic reaction" – burning, irritated eyes, blocked nasal passages, difficulty breathing, dizzy spells and migraine headaches.

Upon his release from lock-down plaintiff requested medical attention from a corrections officer. The officer advised plaintiff to submit a medical request form but cautioned him that none of the medical staff were present at the time.

The corrections officer also advised plaintiff that the facility was a smoke-free facility and prisoners smoked inside at their own risk. He advised plaintiff that it is difficult to keep inmates

from smoking.

Upon his release from lock-down, plaintiff was assigned a bunk in D-Dorm. According to plaintiff, this facility is designed to house 80 inmates, but when he arrived, there were 92 residents. Plaintiff and others were again forced to sleep on mattresses on the floor and plaintiff complained that his fellow inmates were constantly crossing over his mattress to get to the rest room.

Plaintiff further contended that despite RBDC's no-smoking policy, many of the inmates continue to smoke in D-Dorm. He complained that the security system, in which corrections officers use surveillance cameras to monitor the dorm, is ineffective to stop inmates from smoking in the facility. According to plaintiff, an easier solution to the problem would be for the facility to cease selling tobacco products to inmates. Further, plaintiff alleged that the administration at RBDC has implemented a "Three Smoke Breaks" rule which would allow inmates to exit the building 3-times each day for smoke breaks. However, according to plaintiff, that policy is not uniformly applied or enforced. In fact, according to plaintiff only one corrections officer consistently enforces RBDC's smoking policies. Therefore, plaintiff faults Warden Jones for his choice to continue tobacco sales at RBDC and, for his failure to ensure that his staff enforce RBDC's smoking policies.[4]

---

[4] More specifically, plaintiff alleged, "Even though the administration came up with a new rule which is designed to justify the sale of [tobacco] at the smoke free RBDC, [t]his rule is designed to [accommodate] the smoker by allowing the smokers to exit the building 3 times a day. But. RBDC does not apply or enforce the rule. And even if the staff enjoined [sic] in the three smoke break a day rule and enforced this still would not resolve the fact that as many smoke breaks as RBDC would allow, it still would not be enough to satisfy the nicotine addiction of the smoker. As long as they have [tobacco] in their [possession] the smokers are not going to just sit and wait to be allowed to go out side to smoke. RBDC administration should have known that these inmates are not confined here for obeying rules. This is a facility designed to confine [criminals], disobeying rules and laws is the reason for which each inmate is being housed here." [rec. doc. 5-2, p. 13]

Plaintiff contended that RBDC does not implement an adequate grievance procedure. According to plaintiff, the grievance system in place does not allow inmates to retain copies of their grievances and therefore, inmates are unable to prove exhaustion of administrative remedies.

Nevertheless, plaintiff claims to have filed an "indept[h] report" with the Secretary of the Louisiana Department of Corrections.

### b. Statement of Claims and Facts – Medical Department and Assistant Warden James Shaw [rec. doc. 5-3, pp. 1-21]

Plaintiff complained that the Medical Department at RBDC (Assistant Warden James Shaw, Mrs. Posey, and "Jim") do not follow their own policy and rules which.  Plaintiff contended that his rights were violated when he was booked into RBDC by inmate trustees on February 29, 2008, and no one inquired about his medical status as required by RBDC policy. He again complained that he was forced to share an overcrowded lock-down cell with 7 smokers for three days and that he experienced a severe allergic reaction as a result of his exposure  to tobacco smoke.  According to plaintiff, he complained to a corrections officer upon his release from lock down and requested medical attention.  The corrections officer advised plaintiff that there was no physician on duty and that he should fill out a medical request form.

Plaintiff claimed that when he transferred from East Baton Rouge Parish Prison [EBRPP] to RBDC, he was being treated for a shoulder injury and was taking medication prescribed by a physician at EBRPP.

Plaintiff again complained that the 80 person dormitory to which he was assigned housed 92 inmates. He also complained that at least 80 of the inmates are smokers.

Plaintiff complained that there are no qualified medical staff at RBDC and that his 3 medical requests and 2 grievances went unanswered for a period of 23 days.  He claimed that 23 days after having submitted his first medical request, he was examined by Mrs. Posey, a medical clerk/secretary.  Two weeks later, plaintiff was examined by Jim, a part time nurse at RBDC. Plaintiff also complained that Jim is not a qualified medical professional. In any event, Jim put plaintiff on the list to see a physician and within 30 days of his arrival at RBDC, plaintiff was examined by a  physician, Dr. Bailey. Plaintiff advised Bailey of his allergic reaction to second-hand tobacco smoke (sinus inflammation and migraine headaches) and the pain that he still had in his right shoulder.  Bailey prescribed medication for plaintiff's shoulder, sinus inflammation, and headaches. He also provided plaintiff with sleep medication to allow plaintiff a better night's rest.  On the following day, plaintiff was advised by Nurse Posey that only the sleep medication was free, he would be required to pay for the other medication ordered by Dr. Bailey.  Plaintiff claimed that this is a violation of RBDC policy which states that indigent inmates should be afforded medication and allowed to pay from their inmate account as funds become available. Plaintiff also complained that he was charged $10 for his initial medical screening and that this violated RBDC policy.

### c. Relief Requested [rec. doc. 5-3, pp. 22-25]

Plaintiff claimed that he suffers "humiliation and frustration" because he was forced to live in unsanitary and unhealthy conditions. He claimed that the unhealthy conditions caused medical problems which interfered with plaintiff's daily activities and aggravated his pain and suffering.  He prayed for punitive damages in the amount of $275,000 and an injunction directing the defendants to address and correct each of his complaints.  He specifically prayed that the

defendants be ordered to prepare a plan to provide each inmate with "... medical, dental and psychiatric screening by a trained professional ... [upon their] arrival at RBDC..." Plaintiff also requested an order directing defendants to transfer him to another facility where he can obtain work-release status.

### d. Pleading received July 28, 2008 [rec. doc. 8]

On July 28, 2008 plaintiff submitted an untitled pleading advising the court of his transfer to ECDC. He alleged that both ECDC and RBDC are operated and supervised by Sheriff Shumate. He alleged that ECDC and RBDC operate under the same rules and are both designated as smoke free facilities. According to plaintiff, unlike RBDC, ECDC enforces the "three smoke break rule" but, according to plaintiff the smokers still often disregard the indoor smoking ban. He again asked the court to ban the sale of tobacco at both RBDC and ECDC.

## 3. Second Amended Complaint, Brief in Support, and Motion for Temporary Restraining Order [rec. doc. 9]

In his Second Amended Complaint, filed on August 28, 2008, plaintiff again rehashed the allegations of fault previously raised in his original and amended complaints. He again alleged that the RBDC defendants (Shaw, Posey, Doe, and Shumate) delayed providing him with medical attention in the form of a doctor's visit for a period of one month. He admited that he was eventually examined by a physician, Dr. Bailey, who prescribed unspecified medication to relieve plaintiff's allergy symptoms. Nevertheless, plaintiff maintained that the defendants refused to provide the medication (medication for sinus allergies, headache medication, medication for his shoulder, and a sleep aid) to him at no cost and instead advised him that he would be required to pay a portion of the costs of the physician's examination and a portion or all of the costs of the medication. He also again alleged that the RBDC administration was in

violation of the Louisiana Clean Air Act because of their lax enforcement of their no smoking policy and because of their policy of selling tobacco products to inmates. As noted above, plaintiff prayed for a Temporary Restraining Order prohibiting the sale of tobacco at RBDC and a TRO directing the RBDC Medical Department to provide the medication that was ordered by Dr. Bailey. He also prayed for an unspecified amount of money damages.

Plaintiff also filed a brief in support of the second amended complaint. [rec. doc. 10] Therein he requested a TRO prohibiting the sale of tobacco products at RBDC (Phases I and II) and at East Carroll Detention Center, where he is presently confined. Finally, plaintiff also filed a proposed order styled "R.B.D.C. Medical Dept. Order to Show Cause and Temporary Restraining Order." [doc. 11]

## Law and Analysis

### 1. Screening

When a prisoner sues an officer or employee of a governmental entity pursuant to 42 U.S.C. §1983, the court is obliged to evaluate the complaint and dismiss it without service of process, if it is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C.1915A; 28 U.S.C.1915(e)(2). *Ali v. Higgs*, 892 F.2d 438, 440 (5th Cir.1990).

A claim is frivolous if it lacks an arguable basis in law or in fact. *Booker v. Koonce*, 2 F.3d 114, 115 (5th Cir.1993); see, *Denton v. Hernandez*, 504 U.S. 25, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992). A civil rights complaint fails to state a claim upon which relief can be granted if it appears that no relief could be granted under any set of facts that could be proven consistent with the allegations of the complaint. Of course, in making this determination, the

court must assume that all of the plaintiff's factual allegations are true. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir.1998).

A hearing need not be conducted for every *pro se* complaint. *Wilson v. Barrientos*, 926 F.2d 480, 483 n. 4 (5th Cir.1991). A district court may dismiss a prisoner's civil rights complaint as frivolous based upon the complaint and exhibits alone. *Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir.1986).

District courts must construe *in forma pauperis* complaints liberally, but they are given broad discretion in determining when such complaints are frivolous. *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir.1994).

A civil rights plaintiff must support his claims with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir.1995). Furthermore, a district court is bound by the allegations in a plaintiff's complaint and is "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint." *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d at 97.

Plaintiff has provided an original complaint and two amended complaints, along with a request for a TRO and a brief in support of that request. His original complaint – totaling 17 hand-written pages – along with the amended complaint – totaling approximately 67 hand-written pages – and his Second Amended Complaint of 24 pages – allege facts sufficient to conduct and conclude a preliminary screening pursuant to §1915.

Taken together, the complaints allege the following broad claims for relief: (1) exposure to environmental tobacco smoke in the RBDC lock-down cell for the period from February 29,

2008 – March 3, 2008 and in RBDC's D- dorm for the period from March 3, 2008 – early July, 2008[5]; (2) overcrowded conditions of confinement in lock-down and D dorm during the periods set forth above; (3) denial of prompt and adequate medical care and attention; and, an (4) inadequate prison grievance system.[6]

Accepting all of plaintiff's allegations as true, the undersigned concludes, for the reasons stated hereinafter, that his complaint should be dismissed for failure to state a claim for which relief might be granted.

### 2. Exposure to Environmental Tobacco Smoke

Plaintiff argues that the defendants violated Louisiana's "Clean Air Act;" he also argues that the defendants violated his Eighth Amendment rights by subjecting him to cruel and unusual punishment when they exposed him to "second hand" or environmental tobacco smoke during the time he was incarcerated at RBDC.[7] He seeks (1) monetary damages and (2) injunctive relief.

To state a claim under § 1983, a plaintiff must allege the violation of a right secured by

---

[5] In the pleadings filed on July 14, 2008, which were post-marked July 11, 2008 [rec. doc. 5-4, p. 8], plaintiff alleged that he had been transferred away from RBDC between that date and the date of his last correspondence to the court. His previous correspondence was dated June 28, 2008 [rec. doc. 4], therefore plaintiff was transferred some time in early July, 2008.

[6] In his original pleading, plaintiff also alleged a series of specific complaints, most of which are related to one or more of these four general complaints. For example, with regard to the claims that plaintiff was exposed to environmental tobacco smoke, he alleged that (1) the defendants sell tobacco in their smoke free facility; (2) they allow smoking in the facility; (3) they neglect the rights of non-smokers; (4) they sell tobacco to inmates confined in lock-down; (5) they violate Louisiana's "Clean Air Act. " With regard to the administrative remedies issue, he alleged, that the defendants (6) use improper grievance and (7) medical forms, and (16) deny proper administrative remedies forms. With regard to his general conditions of confinement claim he alleged (15) that the defendants force inmates to sleep on the floor due to overcrowding. Finally, however, plaintiff alleged a variety of complaints which are unrelated to his main claims such as (8) defendants entrap smokers; (9) they deny inmates the right to file legal actions and (10) interfere with incoming and outgoing mail; (11) transfer inmates to "disciplinary camps" in retaliation for filing lawsuits; (12) deny access to the law library; (13) allow inmates access to other inmates private files and (14) allow inmates to book newly arrived inmates into the facility. [rec. doc. 1, pp. 2-3]

[7] Plaintiff makes no such claims with regard to his confinement at ECDC.

the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Thus, to the extent that plaintiff maintains that he is entitled to relief based on the defendants' violation of the Louisiana "Clean Air Act," he fails to state a claim for which relief may be granted since violations of Louisiana law are not cognizable in actions filed pursuant to §1983.

However, to the extent that plaintiff seeks relief pursuant to alleged Eighth Amendment violations, his claims deserve closer scrutiny. Plaintiff argues that the defendants have failed to enforce RBDC's no-smoking policies, forcing him to live in an environment where he is exposed to environmental tobacco smoke. He alleges that his exposure to this environmental tobacco smoke, first in the RBDC lock-down, and later in D-Dorm, has caused him to suffer migraine headaches, dizziness, eye irritation, and, sinus problems.

In *Helling v. McKinney*, 509 U.S. 25, 33-35, 113 S.Ct. 2475, 2481-482, 125 L.Ed.2d 22 (1993), the Supreme Court held that prison officials may violate the Eighth Amendment's prohibition against cruel and unusual punishment by exposing inmates to <u>excessive levels</u> of environmental tobacco smoke. The Supreme Court identified both objective and subjective elements.

Objectively, a plaintiff must show that he himself is being exposed to unreasonably high levels of environmental tobacco smoke. The objective factor generally relies on scientific and statistical data concerning the harm caused by environmental tobacco smoke and focuses on the issue of whether society considers the risk to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.

Subjectively, the plaintiff must prove deliberate indifference, considering the defendant-officials' current attitudes and conduct and any policies that have been enacted.

Therefore, to obtain relief, a prisoner must allege and prove not only that the level of environmental tobacco smoke to which he is/was exposed is unreasonable and thus a violation of contemporary standards of decency, but also that prison officials have shown "deliberate indifference" to the health risks associated with second hand smoke.

The adoption of a no smoking policy bears heavily on the inquiry into deliberate indifference. See also, *Whitley v. Hunt*, 158 F.2d 882, 887-88 (5 th Cir.1998); *Rochon v. City of Angola*, 122 F.3d 319, 320 (5th Cir.1997); *Wilson v. Lynaugh*, 878 F.2d 846 (5th Cir.), cert. den., 493 U.S. 969, 110 S.Ct. 417, 107 L.Ed.2d 382 (1989).

### a. Objective Component

Plaintiff alleges he was exposed to high levels of environmental tobacco smoke during his 3 day confinement in lock-down and thereafter during the four month period (March – July) he was confined in D-Dorm prior to his transfer from RBDC to ECDC.[8] Plaintiff concedes that RBDC has enacted a no-smoking policy with regard to the prison; however, he contends that the defendants failed to take sufficient steps to actively enforce the indoor smoking ban.

As discussed above, to show that he was exposed to unreasonably high levels of environmental tobacco smoke, a civil rights plaintiff will ordinarily be required to provide statistical and scientific evidence to support the objective component of his burden of proof.

---

[8] Plaintiff was transferred from RBDC to ECDC sometime prior to July 14, 2008. Since his transfer, plaintiff has filed (1) an amended complaint [rec. doc. 5], (2) a Motion to proceed in forma pauperis [rec. doc. 6]; (3) a letter to the court [rec. doc. 8]; (4) a Second Amended Complaint [rec. doc. 9]; (5) a supplemental brief [rec. doc. 10]; and, (6) a Motion for Temporary Restraining Order [rec. doc. 11]. Other than a general allegation that both prisons are under the supervision of Sheriff Shumate, plaintiff has made no specific complaints concerning the conditions of confinement at ECDC and has not alleged fault on the part of any of the staff at that institution.

This task has made easier by the United States Surgeon General's June 2006 report which concluded that there is <u>no safe level of or exposure to second hand smoke</u>.[9] The undersigned takes judicial notice of that finding, as authorized by Fed.R.Evid. rule 201(f).

The Surgeon General's Report leads to the inescapable conclusion that housing inmates in a facility where the non-smoking policy is consistently and strictly enforced would be the sole efficacious means to prevent a further serious risk of harm to non-smoking prisoners such as the plaintiff.[10]

Based on the foregoing, it will be assumed – for purposes of this Report – that the scientific evidence in the Surgeon General's 2006 Report meets the objective component of *Helling*, as well as *Helling's* requirement of a showing that society considers the risk to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a

---

[9] See <u>The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General-Executive Summary</u>, available at http:// www.surgeongeneral. gov/library/secondhandsmoke/report/executivesummary.pdf (last visited September 10, 2008).

[10]    The Surgeon General summarized his July 2006 report, at http:// www.surgeongeneral.gov/news/speeches/06272006a.html, as follows:"The Surgeon General's Report that we are releasing today, The Health Consequences of Involuntary Exposure to Tobacco Smoke, documents beyond any doubt that secondhand smoke harms people's health. In the course of the past 20 years, the scientific community has reached consensus on this point."I would like to draw your attention to several new conclusions that I have reached due to overwhelming scientific evidence. Secondhand smoke exposure causes heart disease and lung cancer in adults and sudden infant death syndrome and respiratory problems in children.There is NO risk-free level of secondhand smoke exposure, with even brief exposure adversely affecting the cardiovascular and respiratory system. Only smoke-free environments effectively protect nonsmokers from secondhand smoke exposure in indoor spaces. Finally, the Report concludes that, while great strides have been made in recent years in reducing nonsmoking Americans' secondhand smoke exposure, millions of Americans continue to be exposed to secondhand smoke in their homes and workplaces. We know that secondhand smoke harms people's health, but many people assume that exposure to secondhand smoke in small doses does not do any significant damage to one's health. However, science has proven that there is NO risk-free level of exposure to secondhand smoke. Let me say that again: there is no safe level of exposure to secondhand smoke. Breathing secondhand smoke for even a short time can damage cells and set the cancer process in motion. Brief exposure can have immediate harmful effects on blood and blood vessels, potentially increasing the risk of a heart attack. Secondhand smoke exposure can quickly irritate the lungs, or trigger an asthma attack. For some people, these rapid effects can be life-threatening. People who already have heart disease or respiratory conditions are at especially high risk."

risk, as also set forth in the conclusion of the Surgeon General's report – "Since 1986 the attitude of the public and social norms around secondhand smoke exposure have changed dramatically to reflect a growing viewpoint that the involuntary exposure of nonsmokers to secondhand smoke is unacceptable."

That, however, does not end the inquiry.


***b. Subjective Component***

The Eighth Amendment's prohibition against "cruel and unusual punishment" forbids the unnecessary and wanton infliction of pain. Among unnecessary and wanton inflictions of pain are those that are totally without penological justification. In making this determination in the context of prison conditions, a court must ascertain whether the officials involved acted with deliberate indifference to the inmates' health or safety. We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. *Hope v. Pelzer*, 536 U.S. 730, 737-738, 122 S.Ct. 2508, 2514-2515, 153 L.Ed.2d 666 (2002), and cases cited therein.

The Supreme Court defined "deliberate indifference" as "subjective recklessness", or, in other words, a conscious disregard of a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1980, 128 L.Ed.2d 811 (1994). A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for his needs and safety. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir.2006), citing *Domino v. Tex. Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001).

Among other things, plaintiff contends that the defendants approved and condoned the selling of tobacco products in the prison commissary, established a policy of housing smoking and non-smoking inmates in the same housing units, and that these defendants selectively enforced the no-smoking policy. He argues that the very fact that tobacco products are sold at the prison and that other inmates are permitted to smoke violated his right to a smoke-free environment. He contends that through his grievances he made the defendants aware that the no-smoking policies were not being strictly enforced. He also argues that he submitted grievances and complaints which detailed the problems that exposure to second-hand smoke was causing him, thus establishing that the defendants were deliberately indifferent to his complaints and failed to either enforce the smoking policies or ban tobacco products at the prison. Plaintiff claims that the defendants sold tobacco products in the prison commissary, were aware that inmates smoked tobacco products in all areas of the prison, and implemented and maintained a policy of forcing him to live in the same housing units as inmates who smoked tobacco. He claims that he complained to the prison medical staff of migraine headaches and sinus congestion; and that ultimately medication was prescribed to alleviate these symptoms, but that the medication has not been provided to him.

While he complains that the defendants failed to adequately enforce the indoor smoking ban, however, he conceded that in many instances disobedient inmates were in fact disciplined when observed violating the rule. Further, he conceded that inmates, especially those housed in D-Dorm, avoided detection by smoking in areas of the dorm where there activity could not be observed. Finally, he conceded, "Even though the administration came up with a new rule which is designed to justify the sale of [tobacco] at the smoke free RBDC, [t]his rule is designed to

[accommodate] the smoker by allowing the smokers to exit the building 3 times a day. But. RBDC does not apply or enforce the rule. And even if the staff enjoined [sic] in the three smoke break a day rule and enforced it this still would not resolve the fact that as many smoke breaks as RBDC would allow, it still would not be enough to satisfy the nicotine addiction of the smoker. As long as they have [tobacco] in their [possession] the smokers are not going to just sit and wait to be allowed to go out side to smoke.  RBDC administration should have known that these inmates are not confined here for obeying rules. This is a facility designed to confine [criminals], disobeying rules and laws is the reason for which each inmate is being housed here." [rec. doc. 5-2, p. 13; emphasis supplied]

In so saying, plaintiff has failed to show that defendants were deliberately indifferent. The Surgeon General's statement regarding the dangers of exposure to second hand smoke at any level was not issued until 2006.  At some point prior to plaintiff's entry into RBDC, prison authorities instituted a series of  no-smoking  policies to prohibit indoor smoking. The implementation of such policies indicates that defendants were not deliberately indifferent to the dangers of second-hand smoke generally. While the complaints tend to establish that violations of the policy occurred, they also show that the defendants were arguably active in disciplining inmates caught violating the smoking regulations.  Plaintiff's illnesses – headaches, sinus problems – could have been aggravated by exposure to second hand smoke, but other than his short confinement in lock-down, he has not alleged that he was constantly exposed to dangerous levels. Although inmates continued to smoke in plaintiff's dorm, the prison officials were not "deliberately indifferent" to the problem. The defendants' failure to clear plaintiff's dorm of all inmates who smoked, and create a non-smoking cell block, or to prohibit the sale of all tobacco

products, is insufficient to prove "deliberate indifference." Moreover, although he has alleged

that the ban on smoking indoors was frequently violated, he does not dispute the fact that

defendants disciplined inmates for smoking-ban violations.

In short, plaintiff has failed to establish the subjective component of his burden of proof

showing defendants were deliberately indifferent. Thus, his claim for damages as a result of his

brief exposure to environmental tobacco smoke at RBDC must fail.

Plaintiff also seeks injunctive relief – both in his original and amended petition, and, in

his subsequent motion for a temporary restraining order [rec. docs. 9-11]. As shown above,

however, plaintiff was transferred from RBDC in July 2008. All of his claims for injunctive relief

are directed at the RBDC and the defendants associated with that institution. The transfer of a

prisoner out of an allegedly offending institution generally render his claims for injunctive relief

moot. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (*per

curiam*); *Cooper v. Sheriff, Lubbock County, Tex.*, 929 F.2d 1078, 1081 (5th Cir.1991) (*per

curiam*) (holding that prisoner transferred out of offending institution could not state a claim for

injunctive relief); see also *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir.2001); *Beck v.

Lynaugh*, 842 F.2d 759, 762 (5th Cir.1988); *Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir.2002);

(quoting *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). [11]

---

[11] As previously noted, in his initial complaint, plaintiff suggested to the court that his complaint be
"upgraded" to a class action suit. He suggested that the class to be certified consisted of the 15 non-smoker residents
of D-Dorm at RBDC. [rec. doc. 1, p. 4] In order for a lawsuit to be certified as a class action under Rule of Federal
Procedure 23(b)(3), the mover must prove that the four prerequisites found in Rule 23(a) and the two additional
requirements in Rule 23(b)(3) are met. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 623 (5th Cir.1999).
Under Fed.R.Civ.P. 23(a), an action may be maintained as a class action if it meets the criteria of numerosity,
commonality, typicality and adequacy of representation. *Mc.Grew v. Texas Bd. Of Pardons and Paroles*, 47 F.3d
158, 161 (5th Cir.1995). The requirements for Rule 23(b) "are 'predominance' and 'superiority': 'Common
questions must predominate over any questions affecting only individual members', and class resolution must be
'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Mullen*, 186 F.3d at

### *3. Medical Care*

Plaintiff also complains that the authorities at RBDC denied him prompt and appropriate medical care both for his previously injured shoulder and for the sinus condition that allegedly manifested a result of his exposure to environmental tobacco smoke. He further claimed that his requests for medical attention were ignored.

According to the plaintiff, after having been at RBDC for 23 days, and having submitted 3 medical requests and 1 grievance, he was called out for sick-call. He was examined by a member of the RBDC Medical Staff named Jim. Plaintiff advised Jim that he was allergic to tobacco smoke and that as a result of his exposure to smoke, he experienced breathing difficulties, and sleepless nights. He also complained of pain in his right shoulder. According to plaintiff, he had previously been diagnosed with a torn rotator cuff in his right shoulder and that authorities at the East Baton Rouge Parish Prison had provided medication for that injury. Jim advised that plaintiff would be examined by a physician.

According to plaintiff, he submitted additional medical request forms, but, as of April 14, 2008 he had still not seen a physician. However, in his amended complaint plaintiff conceded that he was examined by Dr. Bailey within "30 plus days" of his arrival at RBDC. [see rec. doc. 5-3, p. 10 at ¶29] He admitted that Jim provided medication for plaintiff's sinus problems and

---

624, citing *Anchem Products v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997), quoting Fed.R.Civ.P. 23(b)(3). The district court has wide discretion in deciding whether or not to certify a proposed class. *McGrew*, 47 F.3d at 161. Also, *Mullen*, 186 F.3d at 624.Here, it is clear that plaintiff cannot establish numerosity since the class he proposes consists of only fifteen people. Further, because he is a prisoner acting pro se, plaintiff "is inadequate to represent his fellow inmates in a class action" and certification should be denied. *Caputo v. Fauver*, 800 F.Supp. 168, 169-170 (D.N.J.1992); *Fymbo v. State Farm Fire & Casualty Co.*, 213 F.3d 1320, 1321 (10th Cir.2000); *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir.1975); *Ethnic Awareness Org. v. Gagnon*, 568 F.Supp. 1186, 1187 (E.D.Wis.1983); Wright, Miller & Kane, Federal Practice and Procedure 2d : Civil § 1769.9, n. 12. See, *McGrew v. Texas Bd. of Pardons & Paroles*, 47 F.3d 158, 162 (5th Cir.1995). Thus, to the extent that plaintiff's request is a motion for class action certification, it should also be denied.

aspirin for the pain in his shoulder. However, in plaintiff's amended complaint he claimed that certain medications prescribed by Dr. Bailey were withheld because plaintiff could not afford the medical co-pay.

Medical care claims are analyzed under the same standard as conditions of confinement. In order to prevail on such claims, convicts must establish that the refusal or delay in providing medical care was "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Deliberate indifference in the context of the failure to provide reasonable medical care to a convicted prisoner means that: (1) the prison officials were aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the officials actually drew that inference; and (3) the officials' response indicated that they subjectively intended that harm occur. *Thompson v. Upshur County, Texas*, 245 F.3d at 458-59. "[T]he failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001)(emphasis supplied). Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459 (emphasis supplied). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir.1997); see also *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.1999).

More importantly, and *apropos* to the facts of this complaint, the mere fact that a plaintiff disagrees with what medical care is appropriate does not state a claim of deliberate indifference

to serious medical needs. See *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir.1997).

Plaintiff has not alleged facts sufficient to establish deliberate indifference in this context. Plaintiff has not alleged that either of the defendants were aware of facts from which an inference of substantial risk of serious harm could be drawn. Further, even if he had made such a showing, he has failed to show that anyone actually drew such an inference and that their response to his complaints indicated that they subjectively intended that harm occur to him. *Thompson v. Upshur County, Texas*, 245 F.3d 447, 458-459 (5th Cir.2001).

In addition, whether or not these defendants, or any others, "should have perceived" a risk of harm to plaintiff, but did not, is of no moment since "...the failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir.1997); see also *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.1999).

Taken as true for the purposes of this Report, plaintiff's allegations do not establish deliberate indifference to his medical needs by the RBDC staff. By his own admission, plaintiff was examined and treated at least once by a physician and on other occasions by the medical department staff. Further, he was prescribed medication.

Nevertheless, with respect to medical services, plaintiff complains that he was charged for medical services and medicines received from jail medical staff. The policy described by plaintiff is similar to "co-pay" policies or fee-for-service programs under which inmates must bear part of the cost of their treatment. Courts have found these polices constitutionally

permissible so long as they do not interfere with timely and effective treatment of serious medical needs. *Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir.1997) (co-pay policy); *Shapley v. Nevada Bd. of State Prison Comm's*, 766 F.2d 404 (9th Cir.1985) (co-pay policy); *Cameron v. Sarraf*, 2000 WL 33677584, at *3-5 (E.D.Va. March 17, 2000) (No. CIV.A.98- 1227-AM.) (co-pay policy); *Reynolds v. Wagner*, 936 F.Supp. 1216, 1225-1227 (E.D.Pa.1996) (fee-for-service-program); *Johnson v. Dept. of Public Safety and Correctional Services*, 885 F.Supp. 817 (D.Md.1995) (co-pay policy); *Hudgins v. DeBruyn*, 922 F.Supp. 144, 151 (S.D.Ind.1996) (prison policy which provided that inmates could obtain over-the-counter medicine at cost from institution commissary or as part of necessary treatment for serious medical condition did not constitute cruel and unusual punishment even though former policy generally provided medication free of charge in conjunction with inmate's use of sick-call process; inmate's serious medical needs would be met whether inmate was indigent or not). Nothing in the deliberate indifference standard guarantees inmates the right to be entirely free from cost considerations relevant to medical decisions. *Reynolds*, 128 F.3d, at 175. It is only when medical care is denied to inmates because of their inability to pay that deliberate indifference is implicated. See, e.g., *Collins v. Romer*, 962 F.2d 1508, 1514 (10th Cir.1992) (affirming district court finding that statute with no exceptions to the co-payment requirement would be unconstitutional because it would deprive an inmate of meaningful access to medical care); *Johnson*, 885 F.Supp. at 820 (holding statute constitutional "because the policy mandates that no one shall be refused treatment for an inability to pay, [and] the co-pay policy will not result in a denial of care, even for inmates who abuse the system").

The medical services policy described by plaintiff passes constitutional muster. To the

extent that the RBDC defendants violated policy, such an allegation is insufficient to state a claim under §1983.

Further, as with his conditions of confinement claim, plaintiff seeks injunctive relief for his medical care claims against the administration and staff at RBDC. As with his conditions of confinement claim, his request for injunctive relief must also be denied since plaintiff's transfer to ECDC has made that claim moot.

### 4. Inadequate Prison Grievance System

In his original complaint, plaintiff complained that the RBDC grievance system was inadequate. The narrowing of prisoner due process protections announced in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), left prisoners without a federally-protected right to have grievances investigated and resolved. Any right of that nature is grounded in state law or regulation and the mere failure of an official to follow state law or regulation, without more, does not violate constitutional *minima*. See *Taylor v. Cockrell*, 2004 WL 287339 at *1 (5th Cir. Feb.12, 2004) (not designated for publication) (holding that "claims that the defendants violated ... constitutional rights by failing to investigate ... grievances fall short of establishing a federal constitutional claim"). See also *Jones v. North Carolina Prisoners' Labor Union, Inc*., 433 U.S. 119, 138, 97 S.Ct. 2532, 53 L.Ed.2d 629 (Burger, C.J., concurring) (applauding the institution of grievance procedures by prisons but not suggesting that such procedures are constitutionally required); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir.1996) ("[A] state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause."); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir.1994) ("[T]he constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily

established by a state."); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir.1993) (quotation omitted) (holding that a prison grievance procedure is not a substance right and "does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment"); and *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.1988) ("There is no legitimate claim of entitlement to a grievance procedure.").

Since plaintiff has no constitutionally protected right to a prison grievance procedure, his claim to the contrary is frivolous.

### 5. Miscellaneous Conditions of Confinement

Finally, plaintiff complained of miscellaneous conditions of confinement – jail overcrowding and a general unsanitary environment. "[P]rison authorities may not withhold from prisoners the basic necessities of life, which includes reasonably adequate sanitation." *Sanford v. Brookshire*, 879 F.Supp. 691, 693 (W.D.Tex.1994). The United States Constitution "forbids deprivation of the basic elements of hygiene." *Daigre v. Maggio*, 719 F.2d 1310, 1312 (5th Cir.1983) (Eighth Amendment claim). To succeed on a deprivation-of-hygiene claim, plaintiff must show an "extreme deprivation" of sanitation. See *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)(citing *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Furthermore, 42 U.S.C. § 1997e was amended by the Prison Litigation and Reform Act of 1996. Under the current version of the statute, prisoners are barred from recovering monetary damages for mental or emotional injuries "unless there is a prior showing of physical injury." *Crawford-el v. Britton*, 523 U.S. 574, 596, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). The "physical injury" required by § 1997e(e) must be more than *de minimis* but need not be

significant.  *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir.1999) (citing *Siglar v. Hightower*, 112 F.3d 191 (5th Cir.1997).

To the extent that he seeks monetary damages for his brief exposure to overcrowded and unsanitary conditions, he fails to state a claim for which relief may be granted because he has alleged no harm or injury resulting from these complained of conditions. (As shown above, plaintiff's injury, if any, resulted from his exposure to environmental tobacco smoke.) In short, plaintiff's alleged injuries, if any,  are *de minimis* and therefore his claim for monetary damages is legally without merit.  See *Herman v. Holiday*, 238 F.3d 660, 666 (5th Cir.2001) (holding that a plaintiff was not entitled to money damages as a matter of law on his claim for mental and emotional stress due to an increased risk of illness, cold showers, cold food, unsanitary dishes, insect problems, inadequate clothing, and the presence of an open cesspool near the housing unit because he did not allege any physical injuries resulting therefrom); *Harper*, 174 F.3d at 719 (finding that a prisoner complaining about his placement in administrative segregation failed to demonstrate a physical injury as required by §1997e(e) sufficient to support a claim for monetary damages); *Alexander v. Tippah County, Mississippi*, 351 F.3d 626, 630-31 (5th Cir.2003), *cert. denied*, 541 U.S. 1012, 124 S.Ct. 2071, 158 L.Ed.2d 623 (2004) (nausea and vomiting caused by raw sewage on floor of jail cell was *de minimis*).

To the extent that plaintiff claims to be entitled to injunctive relief on this claim, such a claim fares no better since, as shown above, plaintiff's transfer to ECDC renders such claim moot.

*6. Conclusion and Recommendation*

Considering the foregoing,

**IT IS RECOMMENDED THAT** plaintiff's civil rights complaints [rec. docs. 1, 5, and 8] be **DISMISSED WITH PREJUDICE** for failing to state a claim for which relief may be granted;

**IT IS FURTHER RECOMMENDED THAT** plaintiff's requests for injunctive relief [rec. docs. 1, 5, and 8] and his motion for Temporary Restraining Order [rec. docs. 9, 10, and 11] be **DISMISSED WITH PREJUDICE** as **MOOT**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

In Chambers, Monroe, Louisiana, this 11th day of September, 2008.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE